For today's case number 4-16-0-1-0-6, People v. Sadeq. And for the appellant, we have Ms. Terrence. And for the appellee, we have Ms. Dorsch. Is that how you pronounce that? All right. Thank you. You may proceed, Counsel. May it please the Court. Good morning. My name is Jean R. Terrence, and I'm from the Fourth District Office of the State Appellate Defender. You have to speak up a bit, Ms. Terrence. That's not an amplifying. It's just a recording device. So please. Thank you. I'm here on behalf of Majid Sadeq to ask you to vacate his conviction where the trial court failed to suppress the evidence discovered following a prolonged stop violating the Fourth Amendment. And alternatively, to ask you to vacate his conviction and remand for a new trial where defense counsel performed under an actual conflict of interest. In April of 2014, Majid Sadeq, a 26-year-old Yemen native, along with his 21-year-old cousin in the United States on a student visa, were stopped on I-55 just outside of Springfield. They were going 75 miles per hour in a 70-mile-an-hour zone. So the stop was valid? The stop was valid. Ibrahim, who had no contact with the police, was nervous. He stopped in the middle of the road. He pulled over to the shoulder when requested to by the officer. The officer, discovering that Majid had rented the car, asked for both of their IDs and the rental paperwork. At that moment, the officer felt that there was something going on. He began an investigation into other criminal activity. He goes back to his squad car. He does a records check, finds nothing of note. He decides to have Ibrahim come back to the squad car and sit down. He wants to question him with regard to some other activity, not the traffic stop. As the video shows, he peppers him with 25 questions in two and a half minutes, prompting Ibrahim to apologize, not once but twice, because he had difficulty understanding English and difficulty answering those questions. The officer expresses his concern that some other criminal activity is going on other than the traffic stop. He calls for backup, continues his questioning as he's filling out his paperwork. The second officer arrives. We're now more than 10 minutes into the stop. He turns on the camera because he wants to have this questioning of Ibrahim recorded. Thirteen minutes, 45 seconds into the stop, according to the video, the warning ticket is completed. The officer doesn't give Ibrahim the ticket. He instead skips out of his squad car, returns the ID and paperwork to Majid. At this moment in time, the traffic stop is completed. Yet the officer, without reasonable suspicion, engages Majid in two and a half more minutes of questioning. He asks him 17 questions in two and a half minutes, expresses his concern that some criminal activity other than this traffic violation is going on for another two minutes. There was no reasonable suspicion for this prolonged stop. The trial court provided three grounds by which it thought that there was reasonable suspicion. Two of them were related to nervousness, and one of them was related to sharing of conflicting travel information. However, the information regarding any conflict in the travel plans that Ibrahim or Majid gave cannot be used to support grounds for this prolonged stop. First, it was an error because the trial court thought that there had been some testimony of increased nervousness, but there had been. The officer just testified that their nervousness did not decrease. Furthermore, the nervousness that was exhibited in this situation is not enough to support reasonable suspicion when given the totality of the circumstances, it was, in and of itself, reasonable. As your colleagues on the federal branch have explained, nervousness is of limited value. First, most citizens, whether innocent or guilty, are not subject to nervousness. The person who is guilty of a charge will be nervous when confronted by a police officer. Further, the longer the stop continues, the more agitated an individual should be. In this situation, it was unreasonable for the officer to conclude that the nervousness was a big deal. You have two born individuals who have difficulty speaking English. He may not have had trouble understanding what they were saying, but part of this assessment of nervousness was because they were stuttering, because their English was halted. And these are individuals who said, or at least Ibrahim, said to the officer, I'm sorry, I have difficulty with English, I'm trying to understand the questions. So under these circumstances, you have an individual who's told you're getting a warning ticket, yet he's now sitting, being interrogated in a police vehicle. Another police officer shows up at the side of the road, and eventually his passenger in the car is removed and placed into this other street. Although this was supposed to be a warning ticket, it progressively evolved into an investigation on the side of the road. And there was no probable cause, there was no reasonable suspicion, based upon nervousness, when it's justifiable, given the situation of the stop. Because this nervousness was not enough, we asked this court to vacate this conviction. Because that evidence discovered as a result of the further search of the car should have been suppressed. And there are no further questions with that. I would like to mention with regard to the actual conflict of interest, that he did indeed suffer under an actual, the attorney in this case suffered an actual conflict of interest, given that he offered in stipulation evidence inculpating Majeed Sadiq. Instead of offering a positive alternative defense for him, which would have been reasonable. And in that regard, I ask this court, alternatively, to vacate the conviction and remand for a new trial with the Conflict of Interest Counsel. But there are no further questions. Good morning. I'm Assistant Attorney General Kathryn Dorsch on behalf of the people. My opponent didn't mention it, but I think I'd probably start with the fines and fees issue. The defendant in this case has challenged various assessments as improperly imposed fines. And it is undisputed that the trial court did not impose those fines. And that two days after the court entered judgment, and one day after he'd even filed his notice of appeal, the clerk instead entered those fines on a, what we're calling an accounts receivable sort of ledger. The parties do agree that the probation op fund fee was in fact a fee and it was properly assessed. And the parties agree that the other challenged assessments are not appropriate. But under the Supreme Court's recent decision in People v. Vara, this court does not have jurisdiction to vacate those fines. This court has already held sort of in Strickland and in Petunia, they sort of presaged Vara and said, these kind of things where the court imposes a fee, it's really a legal nullity. It has no legal effect, but this court has in the past said, but we're going to order the court to vacate it anyway. Now under Vara, the court says what the parties are to do is work together, talk to the clerk, or if necessary, if the clerk is not going to cooperate, then you will have to file a mandamus action against the clerk and the circuit court. This court is well aware that these fines and fees issues become a burden, and I think the Supreme Court is trying to figure out a way to make the trial courts take care of these issues. If there are any questions on Vara? Okay. The Fourth Amendment issue is the main issue here, and we're really only arguing about the four minutes after Trooper Weiss completed the written citation, but he didn't give it to the driver, Ibrahim. Instead he went, and he went back to the rental car where the defendant was seated, returned his identification, and then returned to the car. He gave the driver his identification, rental agreement, and then asked him some questions after that. Of those four minutes... Wasn't the traffic stop completed at the point that he left the car to talk to Majid, or however his name is pronounced, and left Ibrahim back in the police car? Pardon me? Trooper Weiss had Ibrahim come back to the police car. He talked to him there, got various information, and indicated to him that he was going to ride a warning ticket and observe the things he observed and all. And then he left the car to go back to the Taurus where Majid was sitting to talk to him further. Correct. My point is, with regard to the purpose of the traffic stop, wasn't that all completed at the point when the trooper got out? No. No, it's not all completed. All but completed. Well, what's the but part still? Officer Weiss was certainly within his rights, and it was part of the traffic stop to personally return to Majid the rental agreement and the license to avoid any claim that it got lost, as opposed to giving it to Ibrahim. That would be part of the traffic stop. He could have done that, but he didn't, because by that time he developed a reasonable and articulable suspicion that there was criminal activity at foot. But that's not my question. My question was, wasn't the purpose of the traffic stop over the moment he left the car? Yes. Now, it's a different question that he have sufficient reasonable articulable suspicion to prolong the stop. Yes, and the state conceded that below as well. Well, I thought maybe this wasn't a conceded. You seem to be arguing that until he had returned the material to Majid and talked to him that the traffic stop wasn't yet over. He could return the materials to him and perhaps ask a question or two about their itinerary, but that would be the outside. As far as the state's argument is concerned. Well, I'm looking for bright lines. There's no bright line. Well, it should be the bright line is the purpose of traffic stops over when he left that car. It doesn't deal with bright lines, Your Honor. It would be easier, wouldn't it? Well, I think it's desirable to try to provide guidance for police in the first instance and trial courts and prosecutors. As you're evaluating this, would you cut it off? And it seems to me I don't see any justification for saying that. As a matter of fact, I'm not sure. You know, he could have given to Cousin Ibrahim the rental car stuff and say, give that to Majid and have a nice day. He could, but the Fourth Amendment doesn't require it. I'm not sure if prolonging the stop as a stop, anything beyond when he got out of the car, was appropriate or necessary. You know, we talk about when the clock starts. When does the clock end, the traffic stop? Well, then when he's finished with the ticket or, as people are arguing here, that he's allowed to also, as part of it, return the documents to Majid. When it comes right down to it, it's a matter of maybe 30 seconds. The Fourth Amendment just didn't require him to hand the rental agreement to the cops. But the Supremes have said there's no de minimis standard on this. That's true, but you're asking me whether to draw the line. I draw the line at returning the documents to the passenger. By that time, Trooper Weiss had developed reasonable and articulable suspicion that there was criminal activity at foot. It was said he was suspicious from the get-go because Ibrahim had stopped the car in the right-hand lane of traffic and he had to twice ask him to pull it over to the side of the road. It's not that it never happened that way before, but he said, in all instances, when the driver did stop in the lane of traffic, each one of those involved an arrest. When he talked to them initially and when he was getting their identification, he said that Ibrahim was having trouble providing an answer. It was like he was making his story up. He told them at that point before he went back to the squad car that he was just going to give them a warning, no money, no ticket, just a warning. He ran their identification, came back fine, they weren't wanted for anything. It's his practice to call the driver back to his squad car while he writes these tickets out. He wanted to do so here, too, because, as he mentioned, he's one officer on the scene at this point and he's got two defendants. Both of them, when Trooper Weiss saw them both at the car, they were both extremely nervous. We're not talking about plain nervousness. We're talking about extremely nervousness. Even the case that the defendants say that nervousness alone is not sufficient to establish a probable cause, we're not relying on nervousness alone. We've got extreme nervousness, their heart rates are increased. Trooper Weiss can see that Ibrahim's pulse in his neck, and he can see that Ibrahim's eyes are twitching and Majid is bouncing his leg up and down. And he testified, too, not only were we talking nervousness, but we were talking about his experience as a trooper. His experience when somebody's been advised, as these defendants were more than once, that they're not going to get a ticket, but instead are just going to be given a warning, that nervousness typically almost always decreases. So this is why he speaks of their nervousness is still increased. He expected it in his experience as, you know, 11 years as a trooper, that that nervousness level would come down once he realized, oh, I'm just going to get a ticket, I'm going to go. Once he's in the car, though, Ibrahim can't really give them any story at all. Where have you been? Missouri. Well, where in Missouri? No city, just Missouri. When did you get there? Four or five. How long did you stay? Five or maybe three or maybe four hours. Where did you go? Missouri Gas Station. What did you do there? Business. That's all he can tell them. And it's not because of the language now, because he's not telling them what he's doing there. And we know that Trooper Weiss is concerned that the more information he's getting, the more concerned he becomes, because at the 10-minute mark, he calls for backup. At the 11-minute mark, he's turning on the interior camera in the car to capture what he believes are signs of Ibrahim's extreme, you know, increased nervousness. And so the police officers are allowed to rely on this kind of experience to look at events that normal people or you or I might look at something and not realize that a particular factor or circumstance is indicative of potential crime. And even if individual circumstances alone could have an innocent explanation, the Fourth Amendment doesn't require that the police officer rule out every innocent explanation. We're looking at a totality of the circumstances. It would be pretty easy in a certain case to pick off each individual factor and try to provide an innocent explanation or explain it away. But that's not the analysis here. Officers can rely on their training experience and make inferences and deductions from the facts that are available at the time, common sense things, and make decisions based on that. And under the facts and circumstances in this case, Trooper Weiss was justified in holding the defendant for a brief investigative detention. Are there any more questions about the Fourth Amendment argument? I don't see any. Finally, the attorney conflict claim. The defendant argues that it would have been a better strategy, given that Ibrahim had made an inculpatory statement that wasn't ignominious against him. It would have been a better strategy had counsel chosen a stipulated bench trial for Ibrahim and gone to trial with a reasonable doubt defense for Magic. But that's a claim about trial strategy. That's a Strickland claim. That's not an attorney conflict claim. We don't have a Strickland claim. But he might have had plausible, reasonable doubt defense. Essentially, that's what these defendants relied upon, right? To stipulate a bench trial and hope that the judge would find some reasonable doubt. But the argument that it would have been a better strategy to pursue something without also arguing or explaining how a reasonable doubt defense would have harmed Ibrahim's defense simply doesn't state a conflict claim. For these reasons, we'd ask that you affirm the asserted fourth judgment. Thank you, counsel. Any rebuttal? As to Barr, I would ask the Court to take note that Barr is not yet final and may be modified upon re-hearing. So Justice Freeman's last decision for the Illinois Supreme Court, he's leaving the bench in a week and they're going to undo it. There is a period for a re-hearing allow, so perhaps. What's the early line on that? Unfortunately, I do not have that information. As to the deadline that you requested with regard to the stop in this case, I can tell you what it was. It was when Officer Weiss returned the ID and rental paperwork to Majid. At that point, the stop was over because he had completed all of the tasks he needed to complete for the traffic violation. And then he launched into questioning of other criminal activity. So here we do have a bright line when the stop ended and they were further detained. Moreover, we knew that the officer was not going to release them because of his stated intent. Here, there was no reasonable suspicion to prolong this stop. Yes, there was nervousness. The video shows that they were nervous. But as the stop progressed... How about the explanation? Where are you going? Missouri. How long are you there? Three, four, five hours. Where did you go? What did you do? Gas station. Just the normal conversation. That would strike me as beyond odd. Like someone trying to come up with some version of events, some story. It's just so peculiar. I urge you to look at the totality of the circumstances of this case as required in determining reasonable suspicion. You have two young individuals who have no real contact with police officers who are not native speakers of English. There is a barrier there that they were trying to overcome. It's apparent on the video. There are apologies for the misunderstanding of what the officer is asking and what he's getting at. And this idea that I'm only giving you a warning, but yet now you have to sit in the car and talk to me. Now I have the video recording our conversation. I've told you that I'm suspicious of you. Another police officer is called. Another police officer arrives. The passenger is placed in another police car. All of these things explain this nervousness. So the officer was just simply unreasonable in believing that this served as a basis that other criminal activity was going on. As to the actual conflict of interest, to show an actual conflict of interest, the defendant must show that his attorney's performance was perfected by demonstrating that there was a plausible alternative defense, and that defense was in conflict with or abandoned because of a duty to another. And here that was just the case where inculpatory information was admitted against the defendant where there was a plausible defense. And I ask this Court to vacate the committee.